## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRENDA K. MILLER, )
                     )
      Plaintiff,            )     CIVIL ACTION NO. 3:2007-33
                     )
      v.                     )
                     )
PATTERSON MOTORS, INC.,      )     JUDGE GIBSON
                     )
      Defendant.          )

## MEMORANDUM OPINION and ORDER OF COURT

### I.    Introduction

Before this Court for consideration is Patterson Motors, Inc.'s Motion for Summary Judgment (Doc. No. 18). On February 2, 2007 Brenda K. Miller ("Plaintiff") filed a Complaint against Patterson Motors Inc. ("Defendant") alleging claims of sexual harassment, sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. §2000e, *et. seq.*, ("Title VII") and the Pennsylvania Human Relations Act, 43 P.S.§951, *et. seq.*, ("PHRA"). (Doc. No. 1). On May 2, 2007, Defendant filed an Answer to Complaint and Affirmative Defenses. (Doc. No. 6). Discovery in the case ended on March 31, 2008. (Doc. No. 13). The instant motion, Brief in Support and Concise Statement of Material Facts were filed on June 2, 2008. (Doc. Nos. 18-20). Plaintiff filed a response to Defendant's Concise Statement of Material Facts and Brief in Opposition to Defendant's Motion for Summary Judgment on July 2, 2008. (Doc. Nos. 22-23). Defendant filed a Reply Brief and Reply to Concise Statement of Material Facts on July 30, 2008. (Doc. Nos. 26-27). On September 19, 2008, Plaintiff filed a

1

Second Supplemental Brief in Opposition to Defendant's Motion for Summary Judgment. (Doc. No. 34). Based on consideration of the foregoing and for the following reasons, Defendant's Motion will be denied in part and granted in part.

## II. Factual Background

Unless otherwise indicated, the following facts are undisputed. Defendant is an automobile dealership located in Altoona, Blair County, Pennsylvania. Plaintiff was hired by Defendant as an automobile salesperson on September 28, 2004. Immediately prior, Plaintiff had worked as a salesperson at Courtesy Ford, a car dealership also located in Altoona. Aside from her position at Courtesy Ford, Plaintiff had no prior experience in car sales. In her deposition, Plaintiff testified that prior to her position at Courtesy, she was a salesperson for Mary Kay Cosmetics. (Pl.'s Depo., p. 33 at 10-12). Prior to her position at Mary Kay, Plaintiff sold advertising for a company called Menu Master. (Pl.'s Depo., p. 33 at 15-18). Plaintiff's primary responsibility in her position at Patterson Motors was to sell cars. Her direct supervisor was Barry Robison who, during Plaintiff's employment with Defendant, was a sales manager. Barry Robison reported to Tim Edmundson, the dealership's General Manager.

### A. Defendant's Policies on Absence and Sales Quotas

According to Plaintiff, she was hired by Defendant the day she applied for the position by Brandon Butts. Plaintiff asserts that, at the time she was hired, Butts informed her that she would have a 90-day training period and that during said period, she would not be expected to meet a sales quota and likewise would not be terminated for failing to meet quota. (Pl.'s Reply to Def.'s Statement of Facts at ¶1). Additionally, Plaintiff testified at her deposition that Butts explained to her a "call-off policy," namely, that if Plaintiff needed to call off, she was required to call in and

2

advise that she would not be in to work "and that she would not get into trouble." (Pl.'s Reply to Def.'s Statement of Facts at ¶2). Defendant disputes these facts as asserted by Plaintiff. Specifically, Defendant denies that Butts had the authority to make any representations regarding a training period, quotas, or an absence policy. Rather, according to Defendant, its "standard training period was two weeks, and Plaintiff admits that she only trained for a period of one week. Plaintiff also admits that she was given a sales quota of eight to twelve cars per month by her manager ... ." (Def.'s Reply to Pl.'s Statement of Facts at ¶1). Moreover, Defendant states that its policy in regard to call-offs required salespersons to call in and personally speak to a supervisor or manager. (Def.'s Reply to Pl.'s Statement of Facts at ¶2).

Defendant gave its sales people, including Plaintiff, a choice between two pay plans. The first plan was straight commission. Under this plan, a sales person had no minimum sales requirement or quota and received no salary. The second option offered a fixed weekly salary plus a reduced rate of commission. Plaintiff opted for the second option, which means she received a salary of $250 a week, plus commission. According to Defendant, as part of this plan Plaintiff was required to meet a sales quota of eight to twelve cars per month, or she could be terminated for lack of sales. (Def.'s Statement of Facts at ¶21). Plaintiff understood that she would have a sales quota of eight to twelve cars per month, but she further testified that it was her understanding that she was not required to meet this quota strictly. (Pl.'s Depo., p. 62-66). Specifically she testified, "If you came within a couple of cars, a couple of sales, whatever, from

that goal they said that they weren't going to kick you to the curb or anything." (Pl.'s Depo., p. 63 at 7-11).

3

Between September 28, 2004 and November 8, 2004, Plaintiff participated in the sale of three cars. According to Defendant, two of these sales were "split" with another sales person, therefore only one sale was attributable to Plaintiff. (Def.'s Statement of Facts at ¶20). Plaintiff, however, denies that only one sale was attributable to her, as she was assisted on two of the sales for instructional purposes. (Pl.'s Reply to Def.'s Statement of Facts at ¶20).

At the time of Plaintiff's employment, Defendant did not have a written attendance policy. (Def.'s Statement of Facts at ¶2; Pl's Reply to Def.'s Statement of Facts at ¶2). In regard to Defendant's attendance policy, a sales manager, Robert Kyle, testified that all sales people "were expected to show up." Further, Tim Edmundson stated in his deposition, "[i]f [sales persons] are on a salary, we are not going to pay [them] to stay at home." (Def.'s Statement of Facts at ¶8; Pl.'s Reply to Def.'s Statement of Facts at ¶8).

Plaintiff understood that, as a new employee, she did not have any paid vacation days, sick days, or other paid time off. Originally in her PHRC Discharge Questionnaire, (Appx. to Def.'s Motion for Summary Judgment at Exh. 8), Plaintiff stated that she called off work three times during her five weeks of employment at Defendant's dealership. (Def.'s Statement of Facts at ¶10; Pl.'s Statement of Facts at ¶10). Plaintiff now asserts that this is inaccurate. (Pl.'s Reply to Def.'s Statement of Facts at ¶¶10-11). According to Plaintiff, payroll and attendance records indicate that she missed two days of work because of illness: October 29, 2004 and November 6, 2004. (Pl.'s Reply to Def.'s Statement of Facts at ¶11).

*B.      Incidents involving Shawn Wimbush and Defendant's Harassment Policy*

Plaintiff's first day on the sales floor after training was October 4, 2008. Plaintiff alleges that on that day she was approached by another salesperson, Shawn Wimbush, who began to

immediately sexually harass her by asking her personal "blunt" questions, touching her hair and back, blowing in her ear, and giving her massages on her shoulders. (Pl.'s Statement of Facts at ¶¶3-4). At her deposition, Plaintiff testified that Wimbush's advances were unwelcome and that she repeatedly told him that she found his conduct offensive and uncomfortable and to stop. (Pl.'s Statement of Facts at ¶5; Pl.'s Depo., p. 112 at 9-23). Plaintiff testified that several other sales persons and managers were in the area when Wimbush approached her. (Pl.'s Depo., p. 111 at 16-24). Plaintiff further testified at her deposition that, between October 4, 2008 and October 30, 2008 Wimbush sexually harassed her on a daily basis, by touching her on the shoulders and hair, blowing in her ear and touching her upper thigh. (Pl.'s Depo., pp. 113-116, 124-125, 148-149, 156). Additionally, Plaintiff testified that Wimbush would make inappropriate and offensive sexual comments and gestures to her. (Id.). Plaintiff documented Wimbush's specific conduct daily in a diary. (Appx. to Def.'s Motion for Summary Judgment at Exh. 3).

At all times relevant to this case, Defendant had a harassment policy in place, which Plaintiff read, understood and signed on September 27, 2004. (Def.'s Statement of Facts at ¶28; Pl.'s Reply to Def.'s Statement of Facts at ¶28). The policy, entitled "'No Harassment' Policy/ Procedure" provides in relevant part as follows:

Dean Patterson Inc. does not and will not tolerate harassment of our employees. The term "harassment" includes, but is not limited to, slurs, jokes and other verbal, graphic, or physical conduct relating to an individual's race, color, sex, religion, national origin, citizenship, age, or disability. "Harassment" also includes sexual favors, unwelcome or offensive touching, and other verbal, graphic or physical conduct of a sexual nature.

VIOLATION OF THIS POLICY/PROCEDURE WILL SUBJECT
AN EMPLOYEE TO DISIPLINARY [sic] ACTION
UP TO AND INCLUDING IMMEDIATE DISCHARGE

5

> If you feel you are being harassed in any way by another employee or vendor, you should make your feelings known to your supervisor immediately. The matter will be thoroughly investigated, and where appropriate, disciplinary action will be taken. If you do not feel that you can discuss the matter with your supervisor or if you are not satisfied with the way your complaint has been handled, please contact either Arlene Weller or Patricia Sheffer. You will not be penalized in any way for reporting such conduct concerning yourself or another person.
>
> Do not assume that the company is aware of your problem. It is your responsibility to bring your complaints and concerns to our attention so that we can help resolve them.

(Appx. to Def.'s Motion for Summary Judgment at Exh. 15). Shawn Wimbush also acknowledged that he read, understood, and agreed to abide by this policy by signing it at the time of he was hired, on September 29, 2003. (Appx. to Def.'s Motion for Summary Judgment at Exh. 16; Def.'s Statement of Facts at ¶32; Pl.'s Reply to Def.'s Statement of Facts at ¶33).

Plaintiff understood that, under this policy, she was to report harassment to either her immediate supervisor, Barry Robison or the GM, Tim Edmundson. She understood that she also had the option of reporting harassment to Arlene Weller or Patricia Sheffer. (Def.'s Statement of Facts at ¶33; Pl.'s Reply to Def.'s Statement of Facts at ¶33). Between October 4, 2008 and October 29, 2007 Plaintiff testified that she made no direct report of harassment by Shawn Wimbush to any of these individuals. (Def.'s Statement of Facts at ¶36; Pl.'s Reply to Def.'s Statement of Facts at ¶36). However, Shawn Wimbush's personnel file contained a note dated October 14, 2004 by Tim Edmundson which said: "Met with Shawn Wimbush and advised him that Brenda said he was making her feel uncomfortable around him. Advised Shawn not to talk to her or get near her anymore." (Appx. to Pl.'s Statement of Facts at Exh. 13). Additionally, a note in Plaintiff's file by Tim Edmundson dated October 27, 2004 stated: "Brenda Miller came to me and

6

advised me that Shawn Wimbush was making passes at her and touching her hair and neck. I talked to Shawn and advised him that he needed to stop immediately and not to say [sic] or touch her." (Appx. to Pl.'s Statement of Facts at 13). According to Defendant, the dates on these notes are a mistake as "Plaintiff herself does not contend that she made any complaint ... until October 30, 2004. (Def.'s Reply to Pl.'s Statement of Facts at ¶7).

According to Plaintiff, she made no report of harassment to her direct supervisor, Barry Robison between September 28, 2004 and October 30, 2004 because she was embarrassed. Specifically, Plaintiff testified in her deposition:

> Q.     ... And then [October 23, 2004] you agreed with Gary and Jim that you should go to Barry Robison.
> A.     Yeah.
> Q.     You were comfortable with Barry Robison?
> A.     Not really, but I didn't really think I had much of a choice.
> Q.     Okay.
> A.     It's just embarrassing, you know? I was embarrassed.

(Pl.'s Depo., p. 164 at 3-13). In regard to Tim Edmundson, Plaintiff testified:

> Q.     What about Tim Edmundson? Were you uncomfortable with him in any way?
> A.     Going to him?
> Q.     Uh-huh (yes).
> A.     I didn't even think of going to him.
> Q.     You never thought of going directly to him?
> A.     I never really even saw him that often.

(Pl.'s Depo., p. 164 at 14-23). Plaintiff also testified that she did not go to Arlene Weller because Weller was her neighbor and she felt uncomfortable reporting Wimbush's harassment to her:

> Q.     Did you go to Arlene Weller during your first week and tell her about this conduct?
> A.     I was going to, but I didn't.
> Q.     Okay. Why didn't you?

7

A.   Because she was a neighbor, and she - - - it was embarassing. I mean, and -
     - -. Her daughter was friends with my older sister. I just didn't - - -. I mean,
     for the neighborhood - - -. You know how people talk, you know? And I
     didn't want to be categorized.

Q.   I guess I have trouble understanding what Arlene Weller being a neighbor
     has to do with whether or not you would report this type of conduct in a
     workplace to her.

A.   I was embarrassed.

Q.   Why were you embarrassed?

A.   I just was.

Q.   I mean, you weren't doing this.

A.   Right.

Q.   This is something that someone else is doing to you.

A.   I know. I was brand new. I didn't want to jeopardize my position, or my job,
     or - - - you know? I thought that that may occur.

Q.   Okay. But just the week prior you had signed this policy on September 27
     that said you should immediately make any harassment known to your
     supervisor, or to Arlene Weller, or Pat Sheffer, correct?

A.   Correct.

Q.   And that, no, you would not be penalized in any way for reporting such
     conduct.

A.   No.

Q.   And even though you had signed that policy a week prior you still felt like,
     for whatever reason, you could not report this conduct to management?

A.   Yes.

Q.   Why did you feel that way?

A.   Well, see, when I was working there I wanted to stay there. I didn't want
     anything to get in the way. I don't know why, actually.

Q.   Okay.
     ....

A.   Or have to, but you know, I thought maybe it would stop. You know, maybe
     he would - - - 'cause they said, well, you know, once he realizes nothing will
     happen he'll leave you alone, you know. I didn't - - -

Q.   So you just were hoping it would stop?

A.   Yeah. ...

(Pl.'s Depo., p 114-16 at 114:10- 116:24). Plaintiff also testified that she made no report during

this time period to Patricia Sheffer. (Pl.'s Depo., p. 124 at 3-4).

    In her deposition, Plaintiff testified that she thereafter made a report of harassment to her

immediate supervisor, Barry Robison, at the end of her shift on Saturday October 30, 2004. (Def.'s

8

Statement of Facts at ¶36; Pl.'s Reply to Def.'s Statement of Facts at ¶36). Specifically, Plaintiff approached Robison and asked if they could speak in private. Plaintiff spoke to Robison for a half hour and informed him that Wimbush was making statements and touching her which made her feel uncomfortable. Plaintiff testified that she told Robison specific comments that Wimbush had made to her and specifics details about Wimbush touching her. (Pl.'s Depo., p. 179 at 1-17). Plaintiff also testified that she told Robison there were other individuals that witnessed Wimbush's conduct. (Pl.'s Depo, p. 179 at 17). In his deposition, Robison testified that Plaintiff did not give him specific details but that she informed him that Wimbush was making comments of a "sexual nature" that made her uncomfortable. (Robison's Depo., p. 18 at 20). Robison's response to Plaintiff's complaint was that he would talk to Tim Edmundson on that Monday, November 1, 2004. He also stated, "we'll take care of the situation." (Def.'s Statement of Facts at ¶36; Pl.'s Statement of Facts at ¶13).

Robison understood that, as a manager, if he received a complaint of sexual harassment he was obligated to discuss the matter with both parties and report the complaint to Tim Edmundson. (Def.'s Statement of Facts at ¶42; Pl.'s Reply to Def.'s S tatement of Facts at ¶42). Robison approached Wimbush about Plaintiff's allegations at the first opportunity he had to do so. (Def.'s Statement of Facts at ¶39; Pl.'s Response to Def.'s Statement of Facts at ¶39). Wimbush denied Plaintiff's allegations. (Def.'s Statement of Facts at ¶39; Pl.'s Response to Def.'s Statement of Facts at ¶39). Robison then reported Plaintiff's complaint to Tim Edmundson. (Def.'s Statement of Facts at ¶40; Pl.'s Reply to Def.'s Statement of Facts at ¶40). On Monday November 1, 2004, Edmundson called Plaintiff into his office to discuss the matter with her. (Def.'s Statement of Facts at ¶45; Pl.'s Reply to Def.'s Statement of Facts at ¶45). Edmundson did not take any notes or ask

9

for a written statement during this meeting. (Pl.'s Statement of Facts at ¶17; Def.'s Reply to Pl.'s Statement of Facts at ¶17). Plaintiff testified that she gave Edmundson specific details regarding Wimbush's conduct. (Pl.'s Depo., p. 183 at 15-18). At his deposition, Edmundson testified that he did not recall specifically what Plaintiff told him in regard to Wimbush's conduct. (Edmundson's Depo., p. 13 at 14-25).

Edmundson then called Wimbush into his office, informing Wimbush that he had received a complaint from Plaintiff that Wimbush had been harassing her. (Def.'s Statement of Facts at ¶48; Pl.'s Reply to Def.'s Statement of Facts at ¶48). Wimbush denied Plaintiff's allegations, however, Edmundson informed him that he was not to have any contact with Plaintiff in the dealership. (Def.'s Statement of Facts at ¶48; Pl.'s Reply to Def.'s Statement of Facts at ¶48). Edmundson then informed Plaintiff that he had spoken to Wimbush and told him not to have contact with her. Additionally, Edmundson informed Plaintiff that she should stay away from Wimbush and that if she had any further complaints to inform him immediately. (Def.'s Statement of Facts at ¶49; Pl.'s Reply to Def.'s Statement of Facts at ¶49). According to Plaintiff, she was upset by Edmundson's response, but she did not inform him of her dissatisfaction. (Pl.'s Depo., p. 188 at 1-25). Plaintiff further testified that she was not given a copy of the policy with information as to how to handle her dissatisfaction. (Id.)

At his deposition, Edmundson testified that in addition to speaking with Plaintiff and Wimbush, he also informed Robison to keep him informed if there were any further problems with between the two. (Edmundson Depo., p. 16 at 14-21). However, Robison testified in his deposition that, to his recollection, he had no further conversations with Edmundson regarding the situation after he initially reported what Plaintiff had told him to Edmundson. (Robison's Depo., p. 26 at 19-

25). Furthermore, Robison testified that he did not conduct any further investigation regarding Plaintiff's complaint, other than to speak to Plaintiff and Wimbush. (Robisons' Depo., p. 26 at 9-18). Edmundson also testified that he gave the same instruction to another sales manager, John Todd; however, Plaintiff disputes this fact as John Todd was not available for deposition. (Def.'s Statement of Facts at ¶50; Pl.'s Reply to Def.'s Statement of Facts at ¶50).

Subsequent to his discussion with Edmundson, Wimbush stopped speaking to Plaintiff and touching her. (Pl.'s Statement of Facts at ¶20; Def.'s Reply to Pl.'s Statement of Facts at ¶20). However, according to Plaintiff, Wimbush would stare at her across the room, lick his lips, talk about her with other employees and laugh at her. (Pl.'s Statement of Facts at ¶20). Plaintiff made no further complaints to Edmundson, to any other manager, or to Arlene Weller and/or Patricia Sheffer after November 1, 2004. (Def.'s Statement of Facts at ¶¶54-59; Pl.'s Reply to Def.'s Statement of Facts at ¶¶54-59).

## C. Plaintiff's Termination

On November 8, 2008, Defendant discharged Plaintiff. (Def.'s Statement of Facts at ¶11; Pl.'s Reply to Def.'s Statement of Facts at ¶11). According to Defendant, it was Robison's decision to discharge Plaintiff. (Def.'s Statement of Facts at ¶12). However, Robison testified that, in regard to Plaintiff, he had discussed his decision to discharge her with upper management. (Robison Depo., p. 42 at 12-21). Plaintiff testified that, at the time she was terminated Robison informed her that it was as a result of her excessive absenteeism. In regard to her meeting with Robison Plaintiff testified:

Q. And you were fired by Barry Robison. We talked about that earlier, right?
A. Yes.

Q.    And he said he didn't really want to do it, but you had missed too many days of work?

A.    Yes, that's what he said.

      ...

Q.    And Barry Robison did not mention your lack of sales on that day?

A.    No.

Q.    No one else was present during that meeting?

A.    No.

(Pl.'s Depo., p. 200 at 16-23; p. 201 at 10-14). Robison told Miller that she was terminated because she mis sed too many days of work. (Def.'s Statement of Facts at ¶15; Pl.'s Reply to Def.'s Statement of Facts at ¶15). Robison testified at his deposition that, while he did not inform Plaintiff at the time, lack of sales was also a factor in her termination. (Robison's Depo., p. 39 at 11-14). Robison made a note for Plaintiff's personnel file, dated November 8, 2004, which stated:

> I Barry D. Robison Used Car Manager at Dean Patterson Chevrolet left [sic] Brenda Miller go because of lack of production and calling off work 3 times within 5 wks. [sic].

(Appx. to Def.'s Motion for Summary Judgment at Exh. 10). Plaintiff testified that, prior to her termination, she received no warning of poor sales performance. (Pl.'s Depo., p. 66 at 8-14).

*D.    Plaintiff's PHRC Proceedings*

The following facts related to Plaintiff's PHRC proceedings are largely undisputed by the parties. Plaintiff intiated charges with the Pennsylvania Human Relations Commission ("PHRC") by filing a Discharge Questionnaire. The Questionnaire was signed by Plaintiff on November 23, 2004. It was received by the PHRC on April 14, 2005. The Discharge Questionnaire is accompanied by a complaint.

In response to questions 4-7 of the Discharge Questionnaire, Plaintiff alleged that she was discharged on November 8, 2004 by Barry Robison for missing too many days of work. She further

12

states that she "followed proper procedure for calling off work and that it only happened three times." In response to question 10 of the Discharge Questionnaire, Plaintiff states, "I believe that I was discharged because I reported a fellow employee for sexual harassment as I was in my fifth week of training that was supposed to last for three months." In response to question 13, Plaintiff stated that Wimbush "constantly harassed me by touching me and making passes at me and saying sexually explicit things to me every day I worked with him."

The PHRC received a Harassment Questionnaire from Plaintiff on May 31, 2005, which was dated May 3, 2005. In response to the first question on this Questionnaire, "explain what happened to you and why you feel you were treated differently" Plaintiff attached a typed response which provides:

1.  I was hired by Dean Patterson in September of 2004. I was supposed to be in training for 90 days. Five weeks into my training period, I reported sexual harassment by a male co-worker. I was told to stay away from him. Approximately one week after I reported the harassment, I was fired. Nothing was done to the person I reported. I was being harassed from the start of my employment.

(Appx. to Def.'s Motion for Summary Judgment at Exh. 21). In response to question 3 of the Questionnaire, Plaintiff indicated that another salesperson, Shawn Wimbush, harassed her. In response to question 4 which asks, "How is this person harassing you," Plaintiff left the question blank.

The PHRC received a Retaliation Questionnaire from Plaintiff on May 31, 2005. This Questionnaire was dated May 16, 2005. Question 1 of the Retaliation Questionnaire asked Plaintiff to "explai n what happened to you and why you feel you were treated differently." Plaintiff attached a response which states:

13

1.    I was hired at Dean Patterson's in September 2004. I was supposed to be in training for 90 days. Five weeks in to my training period, I reported sexual harassment by a male co-worker. I was told to stay away for [sic] him. Approximately one week after I reported the harassment, I was fired. Nothing was done to the person I reported. I was harassed from the start of my employment.

(Appx. to Def.'s Motion for Summary Judgment at Exh. 22). Question 5b of the Questionnaire

asks what Plaintiff did to "demonstrate opposition to this discrimination." In her response, Plaintiff

indicates:

5b.   I reported exactly what was happening to me to my sales manager, Barry Robinson [sic]. He said he was going to discuss this with the General Sales Manager, Tim Edmunson [sic].

(Appx. to Def.'s Motion to Dismiss at Exh. 22). Question 7 of the Retaliation Questionnaire asks

"describe in detail what action was taken against you." Plaintiff's attached response states:

7.    Barry Robinson [sic], Sales Manager, was informed on October 30, 2004 that I was being harassed. He said he was going to take care of this matter and bring it to the attention of General Sales Manager, Tim Edmunson [sic]. That following Monday, November 1, 2004, Barry Robinson [sic] came up to me after the sales meeting and said that he talked to Tim Edmunson [sic] ... . Tim Edmunson [sic] called me into his office and asked me to tell him what happened to me. After I poured my heart out to him and gave him intimate details, which was very embarrassing to me, telling these things to a man I barely know other than my General Sales Manager, he snickered out loud and said to me he was going to talk to Shawn Windbush [sic] ... . I cam [sic] into work on November 8, 2004 (Monday) and almost immediately Barry Robinson [sic] took me into Tim Edmunson's [sic] office and said he thought about it and he decided he was leaving [sic] me go because I called off work too much. When in fact I didn't. ...

(Appx. to Def.'s Motion for Summary Judgment at Exh. 22).

The PHRC sent a letter, including a draft Amended Complaint to Plaintiff's counsel on June

1, 2005. (Appx. to Def.'s Motion for Summary Judgment at Exh. 23). Plaintiff made no changes to

the draft Amended Complaint, and it was signed by Plaintiff and filed, dated June 7,

14

2005. (Appx. to Def.'s Motion for Summary Judgment at Exh. 24). The Amended Complaint contains the following "Underlying Facts":

4. I was hired by the respondent in September 2004 as a car salesperon.

5. I was supposed to be in training for 90 days.

6. Five weeks into my training period, *I was sexually harassed* by Shawn Windbush [sic], a salesperson.

7. On October 30, 2004, I reported the sexual harassment to Barry Robinson [sic], my sales manager.

8. On November 1, 2004, Tim Edmunson [sic], General Sales Manager, called me into his office and I told him in detail about the sexual harassment. He said he would talk to Shawn Windbush [sic].

9. A little later, in the back hall, Mr. Edmunson [sic] said he talked to Shawn and I should just stay away from him.

10. I was very upset about management's reaction to my allegations.

11. For the next week, I was subjected to comments by coworkers such as, "Oh I better not talk to you, you might turn me in." Everyone was very standoffish with me.

(Appx. to Def.'s Motion for Summary Judgment at Exh. 24) (emphasis added). Following these underlying facts, Plaintiff alleges two specific counts: sex discrimination based on Plaintiff's termination and retaliation. Thereafter, Defendant filed an Answer and New Matter in which it responded to the sex discrimination and retaliation claims alleged in Plaintiff's Amended Complaint. (Appx. to Def.'s Motion for Summary Judgment at Exh. 27). Additionally, Defendant's position statement filed on August 15, 2005 addressed Plaintiff's sex discrimination and retaliation claims. (Appx. to Def.'s Motion for Summary Judgment at Exh. 27).

15

On August 22, 2005, the PHRC issued a request for data and documents from Defendant. (Id. at Exh. 28). Defendant filed a response on September 16, 2005, which did not provide any information related to allegations of sexual harassment/sexually hostile work environment. (Id.) Plaintiff received a latter dated March 20, 2006 questioning the existence of witnesses to sexual harassment by Shawn Wimbush. (Appx. to Reply to Def.'s Statement of Facts at Exh. 18). Plaintiff's counsel forwarded a reply, attaching a sexual harassment witness form completed by Plaintiff. (Appx. to Pl.'s Reply to Def.'s Statement of Facts at Exh. 8). The EEOC issued Plaintiff a right to sue letter dated November 13, 2006. (Id. at Exh. 30).

### III.    Standard of Review

Summary judgment under the Federal Rules of Civil Procedure 56(c) is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." In deciding a summary judgment motion, the court must "view the evidence ... through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved [her] case by the quality and quantity of evidence required by the governing law or that [she] did not." *Anderson v. Consolidated Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing'- that is, pointing out to the District Court- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party has carried this burden, then the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there

is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.3d 1224, 1230 (3d Cir. 1993). Thus, the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue of fact for trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.2d 639, 643 n. 3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)).

In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in [their] favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255 (1986)); *see also Doe v. County of Centre, Pa*, 242 F.3d 437, 446 (3d Cir. 2001) (proving that "a court must take the facts in the light most favorable to the nonmoving party, the [plaintiff], and draw all reasonable inferences in their favor") (citation omitted).

## IV. Discussion

### A. Plaintiff's Sexual Harassment Claim

In regard to Plaintiff's sexual harassment claim, Defendant argues that said claim fails because Plaintiff failed to exhaust her administrative remedies before the PHRC. (Def.'s Br. in Support at 3). Specifically, Defendant argues that Plaintiff failed to properly include a charge of sexual harassment in her PHRC complaint and her failure to do so bars that claim. (Id.) Furthermore, Defendant argues that Plaintiff's sexual harassment claims fail on the merits because Defendant effectively stopped the harassment complained of, and therefore, as a matter of law, Defendant cannot be held liable for the harassment. (Def.'s Br. in Support at 12). In response,

17

Plaintiff argues that Plaintiff properly exhausted her administrative remedies because (1) her PHRC complaint referenced her sexual harassment claims and (2) her harassment claims were, in fact, investigated by the PHRC. (Pl.'s Br. in Opp. at 1). Furthermore, Plaintiff contends that her harassment claims do not fail on the merits, as Defendant's harassment policy was "wholly ineffective" and failed to address the harassment by Shawn Wimbush. As such, Plaintiff argues, Defendant is liable for Wimbush's conduct. (Pl.'s Br. in Opp. at 2-3).

### *1.*   *Plaintiff Sufficiently Exhausted Her Administrative Remedies*

Plaintiff's amended complaint filed with the PHRC contains two counts. (Appx. in Support of Def.'s Motion for Summary Judgment at Exh. 23). In the first count, Plaintiff alleges sex discrimination, in the second she alleges retaliation. Defendant contends that Plaintiff's failure to include a separate count for harassment in this complaint precludes her from alleging a claim of sexual harassment here. Moreover, Defendant argues that Plaintiff's claim for sexual harassment is not saved by the fact that she completed a harassment intake questionnaire. (Br. in Support of Summary Judgment at 7). Nor are her harassment claims fairly within the scope of disparate treatment or retaliation claims, such that the allegations in her Complaint were sufficient to exhaust her sexual harassment claim. (Id. at 3-6).

In response, Plaintiff argues that her PHRC Complaint was sufficient to exhaust her sexual harassment claim, insofar as the PHRC conducted an investigation of said claims. (Pl.'s Br. in Opp. at 1). Moreover, Plaintiff argues that her sexual harassment claim before this Court is fairly within the scope of her PHRC Complaint and, therefore, she properly exhausted her administrative remedies. (Pl.'s Second Reply in Opp. at 2-3).

18

Under both Title VII and the PHRA, a plaintiff must exhaust all administrative remedies with the EEOC or appropriate state agency, *i.e.* the PHRC, before proceeding with claims under these statutes in federal court. 42 U.S.C. §§ 2000e-5(e), 2000e-5(f); 43 P.S. §§ 959, 962; *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 470-471 (3d. Cir. 1996); *Hicks v. ABT Assoc.*, 572 F.2d 960, 964-965 (3d Cir. 1978) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973) and *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 (3d Cir. 1976, *cert. denied*, 429 U.S. 1041 (1977)). A plaintiff exhausts her administrative remedies by filing a formal charge within the appropriate time period, permitting the administrative agency to investigate the claims. *Hicks*, 572 F.2d at 964-965. By requiring that a plaintiff exhaust her administrative remedies before bringing a cause of action in district court, "the aim of the statutory scheme is to resolve disputes by informal conciliation." *Anjelino v.The New York Times Co.*, 200 F.3d 73, 93-94 (3d Cir. 1999). As such, "suits in the district court are limited to matters of which the EEOC has had notice and a chance, if appropriate, to settle... ." *Id.* This does not mean that the scope of an action in federal court is limited to the four corners of the administrative charge. *Hicks v. ABT Assoc.*, 572 F.2d 960, 964-5 (3d Cir. 1978). Rather, "the scope of a resulting private civil action in the district court is 'defined by the scope of the [agency] investigation which can reasonably be expected to grow out of the charge of discrimination . . ..'" *Id.* at 966 (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d at 398-99) (citations omitted). *See also Anjelino*, 200 F.3d at 93. Indeed, "the allegations of a Title VII complaint must fall 'fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom.'" *Butterbaugh v. Chertoff*, 479 F.Supp. 2d 485, 497 (W.D. Pa. 2007) (quoting *Atkinson v. Lafyette Coll.*, 460 F.3d 447, 453 (3d Cir. 2006) (citations omitted).

19

Moreover, failure to check a particular box on an administrative agency complaint will not bar a

plaintiff from subsequently bringing those claims in federal court. *Butterbaugh*, 479 F.Supp.2d at

499 (citing *Schouten v. CSX Transp., Inc.*, 58 F.Supp.2d 614, 616 (E.D. Pa. 1999)). Rather, the

scope of the charge will be liberally construed to encompass all claims which were fairly before the

administrative agency. *Id.* at 498; *Anjelino*, 200 F.3d at 93. In this case, Plaintiff's claim for sexual

harassment falls fairly within the scope of her underlying PHRC complaint. First, in the

"Underlying Facts" section of her PHRC complaint, Plaintiff alleges:

6. *Five weeks into my training period,* I *was sexually harassment* [sic] *by Shawn Windbush [sic] a salesperson.*

7. On October 30, 2004, *I reported the sexual harassment* to Barry Robison [sic], my sales manager.

8. On November 1, 2004, Tim Ednumdson [sic], General Sales Manager, called me into his office and I told him in detail *about the sexual harassment.* He said he would talk to Shawn Windbush [sic].

(Appx. to Def.'s Motion for Summary Judgment at Exh.24).    Moreover, Plaintiff's PHRC

Complaint alleges that Defendant retaliated against her as a result of her report of sexual

harassment by a co-worker :

24. ... I informed Barry Robinson [sic], my Sales Manager, that *I was sexually harassed by a coworker.* Tim Edmunson [sic], General Sales Manager, was also aware of my allegations.

25. The person who harmed me knew I reported and *objected to sexual harassment* because Barry Robison [sic] discharged me.

26. I believe the Respondent's actions were retaliatory because management did not take *my allegations of sexual harassment* seriously. Tim Edmunson [sic] told me to just stay away from *my harasser* as his solution to the problem. Eight days later I was fired. ...

(Appx. to Def.'s Motion for Summary Judgment at Exh. 24) (emphases added). Plaintiff's PHRC

complaint alleges that she was discriminated against as a result of continuous sexual harassment by

a co-worker and suffered retaliation after making the Defendant aware of such harassment.

20

Plaintiff's specific allegation that she was sexually harassed by Shawn Wimbush cannot be said to be limited exclusively to a claim for retaliation. *See Butterbaugh v. Chertoff*, 479 F.Supp. 2d 485, 498-9 (W.D. Pa. 2007). Rather, said allegation would have put the PHRC on notice of Plaintiff's sexual harassment claims. *Id.* Indeed, Plaintiff's claim that Defendant is liable for sexual harassment by Plaintiff's co-worker, Shawn Wimbush, is fairly within the scope of her PHRC complaint, insofar as said complaint specifically references the harassment. As this Court held, in *Butterbaugh*, where an administrative complaint specifically references the harassment and the specific "harasser" Plaintiff's "administrative complaints would have encompassed the allegations of sexual harassment." *Id.* at 499. *See also Anjelino*, 200 F.3d at 84.

Furthermore, while a claim of retaliation (based on discharge for a report of sexual harassment) will not necessarily put the administrative agency on notice of the underlying harassment, where the administrative process properly addresses the underlying sexual harassment, it will have been exhausted. *Id.* (citing *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218 (8th Cir. 1994)). By the allegations of the underlying complaint, the PHRC was put on notice of Plaintiff's harassment claims, *see Antol v. Perry*, 82 F.2d 1291, 1296 (3d Cir. 1996), and, furthermore, its investigation into Plaintiff's claims of harassment could be reasonably expected to grow out of her allegation that she was discriminated against and discharged as a result of her complaint of sexual harassment. *See Butterbaugh*, 479 F.Supp.2d 485 ("The Court thus finds it reasonable to conclude that an investigation into Plaintiffs' administrative complaints would have encompassed the allegations of sexual harassment"). In fact, in response to Plaintiff's PHRC Complaint, the agency sought information from Plaintiff in the form of witnesses to the alleged sexual harassment. (Appx. to Pl.'s Reply to Def.'s Statement of Facts at Exh. 8). As such, the

PHRC's investigation does appear to have addressed evidence relating to a sexual harassment claim. *Cf. Visnikar v. Department of Environmental Protection*, No. Civ. A. 02- 963, 2004 WL 438688 at \*6 (W.D. Pa. January 27, 2004).

The Court finds that Plaintiff's sexual harassment claims were fairly within the scope of her Amended Complaint filed with the PHRC. As such, Defendant's Motion for Summary Judgment on these grounds are denied.

### 2. *Plaintiff's Sexual Harassment Claim Against Her Employer Does Not Fail on the Merits*

In regard to the merits of Plaintiff's sexual harassment claim, Defendant contends that said claim fails as Plaintiff cannot establish respondeat superior liability for Shawn Wimbush's conduct. (Def's Br. in Support of Summary Judgment at 12).

Title VII of the Civil Rights Act makes it unlawful for an employer to condone a sexually hostile work environment. 42 U.S.C. §2000e-2(a)(1); *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986). In order for an employer to be liable for condoning a sexually hostile work environment, a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990) (quoting *Vance v. Southern Bell Tel. & Tel. Co.*, 86 F.2d 1503, 1510 (11th Cir. 1989)). The United States Court of Appeals for the Third Circuit has set forth the following elements for a claim of sexual harassment: (1) the plaintiff suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the

22

discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *Id.*

A plaintiff will establish the existence of respondeat superior liability for the "harassing conduct of the [plaintiff's] coworker if the employer was 'negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment.'" *Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) (quoting *Bonenberger v. Plymouth Twp.*, 312 F.3d 20, 26 (3d Cir. 1997) (citing *Bouton v. BMW of N. America, Inc.*, 29 F.3d 103, 106 (3d Cir. 1994)). An employer acts negligently if it "'knew or should have known about the harassment, but failed to take prompt and adequate remedial action.'" *Id.* (quoting *Jensen v. Potter*, 435 F.3d 444, 453 (3d Cir. 2006)) (citations omitted). Thus, Defendant will be liable to Plaintiff if (1) Defendant had notice that Wimbush harassed Plaintiff; and (2) failed to take adequate measures to stop the harassment. *See Kunin v. Sears Roebuck and Co.*, 175 F.3d 289, 294 (3d Cir. 1999) (citing *Bouton*, 29 F.3d at 110) (quotations omitted).

In this case, there are essentially two time periods of alleged harassment, for which Plaintiff alleges Defendant is liable. The first is the time period between her first day on the sales floor, *i.e.*, the first time that Shawn Wimbush sexually harassed her until she informed her supervisor Barry Robison. The second time period is the time period after she informed Barry Robison until her termination on November 8, 2004.

An employer will be put on notice of sexual harassment by a plaintiff's co-worker in two situations: (1) where the plaintiff provides management "enough information to raise a probability of sexual harassment in the mind of a reasonable employer;" or (2) where the harassment is "so pervasive and open that a reasonable employer would have had to beware of it." *Id.* at 294 (citing

23

e.g., *Zimmerman v. Cook County Sheriff's Dep't.*, 96 F.3d 1017, 1018-19 (7th Cir. 1996)). In adopting this standard, the Court of Appeals reasoned:

> We believe that these standards strike the correct balance between protecting the rights of the employee and the employer by faulting the employer for turning a blind eye to overt signs of harassment but not requiring it to attain a level of omniscience, in the absence of actual notice, about all misconduct that may occur in the workplace.

*Id.*

Defendant contends that it cannot be held liable for conduct which allegedly occurred before Plaintiff spoke to Barry Robison about Wimbush's conduct, as Defendant had no notice that Wimbush was sexually harassing Plaintiff. (Reply Br. in Support of Motion for Summary Judgment at 3). Based on the evidence of record, however, the Court finds that Plaintiff has offered sufficient evidence to show that Defendant knew or should have known that Wimbush's was harassing her prior to her conversation with Barry Robison.

The Court agrees with Defendant, that Plaintiff has not provided any evidence that she made any complaints to Defendant prior to her discussion with Barry Robison on October 30, 2004. In fact, Plaintiff testified that she knew and understood Defendant's policy that she should inform Barry Robison, Tim Edmundson, Arlenne Weller or Patricia Sheffer of Wimbush's conduct, but did not make a formal complaint for several weeks. (Def.'s Statement of Facts at ¶36; Plaintiff's Reply to Def.'s Statement of Facts at ¶36).

As a result, Plaintiff has not offered sufficient evidence to show that she provided Defendant with enough information to put Defendant on notice that she was being sexually harassed prior to her conversation with Barry Robison. *See Anderson v. Deluxe Homes of PA., Inc.*, 131 F.Supp.2d 637 (M.D. Pa. 2001) (citing *Kunin*,175 F.3d at 294)("In this context, a plaintiff's

complaints must be specific enough to let an employer know that the problem is sexual harassment).

However, in her deposition, Plaintiff testified that on her first day of work several individuals witnessed Wimbush harass her, including management:

> Q.    ... And then he approached you physically?
> A.    Yes.
> Q.    Where were you when that occurred?
> A.    Right in the middle of the sales floor.
> Q.    Okay. Who else was around?
> A.    Everybody. All the sales managers, people I worked with, Paul, Tamara, Sabrina, you know. I don't remember who exactly was there at that one that particular day, but, I mean, people I worked with. There was no hesitation in his way. He just did whatever he felt at the moment.
> Q.    Okay. So how did you respond when he started rubbing your shoulders and your neck?
> A.    I would push him off.

(Pl.'s Depo., p. 110 at 16-24). Plaintiff further testified that several individuals, including John Todd, a sales manager, told her that this is "just how [Wimbush] is." (Pl.'s Depo., p. 111 at 18):

> A.    John Todd said that once.
> Q.    They said it was normal, referring to what he was doing?
> A.    Yes.

(Pl.'s Depo., p. 112 at 2-8). Additionally, Plaintiff testified that she was repeatedly told by co-workers, including the other women in the workplace, that Wimbush engaged in similar conduct with all of the women there, "Sabrina would say, you'll get used to it, you know? That's just how he is. Everybody — . Even the guys said, that's just how he is, you know? He's like that with all of the women who have worked there." (Pl.'s Depo., p. 158 at 18-24).

Additionally, another female employee Deb Spicer testified at her deposition:

> A.    Shawn was a lady's man and he was always saying something to someone. ...

Q.     Did you ever consider going to management to report Shawn Wimbush's conduct?
A.     No. Because Steve St. John was the manager, he would often talk to Shawn about settling himself down. I mean, he would tell him to settle down, which Shawn would just laugh. ...

\*\*\*

A.     He was always trying to put the make on somebody. It didn't matter who they were, whether it was a customer or, you know, one of us sales. ...

(Spicer's Depo., p. 15 -16 at 15:24-35, 16: 1-18).  Additionally, the affidavit of another female

employee, Tamara Brumbaugh states:

3.     That while employed by Patterson Motors, Inc., I heard Shawn Wimbush ask Brenda Miller if "the carpet matched the drapes."
4.     That while employed by Patterson Motors, Inc., I heard Barry Robison say that Brenda Miller was "going to have to get tougher skin" and "that kind of stuff is just expected" in connection with her problems with Shawn Wimbush.

(Appx. to Pl.'s Concise Statement of Facts at Exh. 16).

Additionally, while Plaintiff concedes that she did not make a formal complaint to Barry

Robison until October 30, 2007,  notes placed in both Plaintiff's and Wimbush's personnel files

suggest that Defendant did, in fact, know that Wimbush was harassing Plaintiff prior to October 30.

In particular, the note in Wimbush's file, dated *October 14, 2004*, states:

Met with Shawm Wimbush and advised him that Brenda said he was making her feel uncomfortable around him.  Advised Shawn not to talk to her or get near her anymore ... .

(Appx. to Pl.'s Statement of Facts at Exh. 13).

While Defendant now argues that the dates on these notes are a mistake, the Court is not at

liberty to make a credibility determination in regard to this evidence at this stage. *See Marino*, 258

F.3d at 247. Rather, regardless of when these notes were written, they are sufficient evidence from

26

which a jury could infer that Tim Edmundson knew of the problems that Plaintiff was having with Wimbush prior to October 30.

Based on this evidence, the Court finds that there are genuine issues of material fact as to whether Defendant knew or should have known of the harassment prior to her discussion with Barry Robison. *Cf. Kunin*, 175 F.3d at 295 (holding that, where management "had little opportunity to discover the harassment" absent actual notice, the employer could not be held liable for harassment by a co-worker). (Comparing *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1016 (8th Cir. 1988)) (quoting *Hall* for the proposition that, "even if supervisor was not aware of all sexual abuse, 'unrelenting pattern of verbal, physical and psychic abuse' involved incidents 'so numerous' that employer was 'liable for failing to discover what was going on ...'"). Moreover, because there is a genuine issue of material fact as to whether Defendant knew or should have known that Wimbush was sexually harassing Plaintiff prior to her complaint to Robison, it is more properly left to a jury to determine whether Defendant had actual or constructive knowledge about the existence of a sexually hostile environment and whether Defendant took appropriate steps to stop the alleged harassment prior to Plaintiff's complaint. *See Andrews*, 895 F.2d at 1486 (citations omitted).

Both Plaintiff and Defendant agree that Defendant was given actual notice of the harassment by Shawn Wimbush on October 30, 2004. (Def.'s Statement of Facts at ¶36; Pl.'s Reply to Def.'s Statement of Facts at ¶36). Defendant argues, however, that because its response was prompt and adequate, it is relieved of liability for Wimbush's conduct. The Court finds, however, that there is a genuine issue of material fact as to the adequacy of Defendant's response.

If an employer's response to notice of harassment effectively stops the harassment, said response will be adequate, as a matter of law. *Knabe v. Boury Corp.*, 113 F.3d 407, 411 n. 8 (3d

27

Cir. 1997); *see also Andreoli*, 482 F.3d at 644 n. 2 (citing *Jensen v. Potter*, 435 F.3d 444, 453 (3d Cir. 2006); *Weston v. Pennsylvania*, 251 F.3d 420, 427 (3d Cir. 2001)). However, the response need not stop the harassment in order to be considered "adequate." *Andreoli*, 482 F.3d at 644 (citing *Jensen* 435 F.3d at 453 (3d Cir. 2006)). Where the remedial measure does not stop the harassment, generally the Court will look to the "timing and nature" of the employer's response. *Id.* (citing *Knabe*, 113 F.3d at 407). Moreover, an employer's response will be "adequate if it is reasonably calculated to end the harassment." *Id.* at 644 (internal quotations omitted)(citations omitted). Additionally, while "the law does not require the investigations into sexual harassment complaint to be perfect," *Knabe*, 114 F.3d at 412-13 (citing *e.g., Saxton v. AT&T Co.*, 10 F.3d 526, 535 (7th Cir. 1993); *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991); *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983)), "an employer can be held liable if a faulty investigation renders its subsequent remedial action inadequate, *i.e.*, not reasonably calculated to prevent further harassment." *Id.* at 414 (citing *Swentek v. USAIR*, 830 F.2d 552, 558 (4th Cir. 1987)).

In this case, Plaintiff made a verbal complaint about Wimbush's conduct to Barry Robison on October 30, 2004. (Def.'s Statement of Facts at ¶36; Pl.'s Reply to Def.'s Statement of Facts at ¶36). In response to Plaintiff's complaint, Robison responded to Plaintiff that he would speak to Wimbush and that he would also inform Tim Edmundson and they would "take care of the situation." (Def.'s Statement of Facts at ¶36; Pl.'s Statement of Facts at ¶13). At his first available chance thereafter, Robison approached Wimbush about Plaintiff's complaint. (Def.'s Statement of Facts at ¶39; Pl.'s Reply to Def.'s Statement of Facts at ¶39). On Monday, November 1, 2004, Robison reported Plaintiff's allegations to Tim Edmundson. (Def.'s Statement of Facts at ¶40; Pl.'s Reply to Def.'s Statement of Facts at ¶40). Edmundson called Plaintiff into his office to discuss the

28

situation with Wimbush that same day. (Def.'s Statement of Facts at ¶45; Pl.'s Reply to Def.'s Statement of Facts at ¶45). Plaintiff testified that she gave Edmundson specific details, but that during this meeting Edmundson took no notes, nor did he ask for a written statement from Plaintiff. (Pl.'s Statement of Facts at ¶17; Def.'s Reply to Pl.'s Statement of Facts at ¶17). No further investigation was done regarding the matter. (Robison's Depo., p. 26 at 9-18).

After his meeting with Plaintiff, Edmundson called Wimbush into his office regarding Plaintiff's complaint. (Def.'s Statement of Facts at ¶48; Pl.'s Reply to Def.'s Statement of Facts at ¶48). Edmundson informed Wimbush that he was not to have any further contact with Plaintiff in the dealership. (Def.'s Statement of Facts at ¶48; Pl.'s Reply to Def.'s Statement of Facts at ¶48). Edmundson then informed Plaintiff in the hallway that she should stay away from Wimbush and to inform him if she had any further problems. (Def.'s Statement of Facts at ¶49; Pl.'s Reply to Def.'s Statement of Facts at ¶49).

At her deposition, Plaintiff testified that Defendant's response to her complaint of harassment was ineffective. Specifically, she testified that after Edmundson informed he that he had spoken to Wimbush and that she should stay away from him Wimbush would stare at her from across the room, lick his lips and blow kisses at her. (Pl.'s Depo., p. 1-6). Additionally, she testified that Wimbush would point at her and laugh while talking to other co-workers:

Q.    And it says that Shawn Wimbush stared at you from across the room, right?
A.    Yes.
Q.    And while he was doing that he licked his lips and blew kisses at you?
A.    Not like this (indicating) but just with his lips.
Q.    Okay. And on one particular occasion he pointed at you?
A.    He was talking to somebody. He was outside, and, you know, you can see through glass. And he looked - - -. He was pointing right at me and shaking his head, laughing. ...

29

(Pl.'s Depo., p. 194 at 1-15).

Reading this evidence in a light most favorable to Plaintiff, she has produced sufficient evidence such that a reasonable factfinder could determine that the harassment did not stop as a result of Defendant's response to her complaint. Therefore, the Court cannot say that Defendant's response to Plaintiff's complaint was adequate as a matter of law. Furthermore, there is an issue of fact as to whether Defendant's response to Plaintiff's complaint of harassment was reasonably calculated to the circumstances to prevent further harassment. While Defendant argues that Plaintiff failed to make any further complaints to Robison or Edmundson about Wimbush's conduct, this alone is not evidence that Defendant's response was adequate. Rather, the issue is whether, based on the "timing and nature" of the response it was adequate. *Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007). While Defendant's response to Plaintiff's actual notice appears to have been prompt (assuming this was Defendant's first notice), there is evidence to suggest that Wimbush's sexual innuendo and touching was a common occurrence not only with Plaintiff but with other female employees and customers, to the extent that he needed to be told to "settle." (Spicer's Depo., p. 15 - 16 at 15:24-35, 16: 1-18). As such, a reasonable jury could find that Defendant's response, *i.e.*, telling Wimbush to stay away from Plaintiff, in particular in a car showroom where Plaintiff and Defendant would likely be in close proximity often, was not reasonably calculated to the problem, so as to prevent further incidents between Wimbush and Plaintiff. Moreover, even assuming that Defendant is correct and that management somehow did not know that Wimbush's conduct was a pervasive problem in the workplace, an investigation involving more employees would likely have led to that discovery and might have informed Defendant's response. Indeed, according to Plaintiff, the response was not adequate to prevent Wimbush from engaging in further harassment. As such,

30

there is an issue of fact as to whether Defendant's response to Plaintiff's complaint to her supervisors in regard to Wimbush sexually harassing her was adequate. *Cf. Knabe*, 113 F.3d at 407 (citing *Ryczek v. Guest Services, Inc.*, 877 F.Supp. 754, 759 (D.D.C. 1995); *cf. Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997)) (holding that, where the plaintiff did not allege further harassment and did not return to work after her employer's response, there was "no evidence that there would have been a hostile work environment had [plaintiff] returned or that [the harasser] would have felt free to continue his harassment upon her return to work").

Because there are genuine issues of material fact as to whether Defendant knew or should have known of harassment prior to October 30, 2004 and as to the adequacy of Defendant's response to the harassment, there are genuine issues of material fact as to whether or not Plaintiff can establish respondeat superior liability. Therefore, Defendant's motion for summary judgment as to Plaintiff's sexual harassment claim is denied.

## B.    Plaintiff's Discrimination Claim

A plaintiff's claims of sex discrimination in violation of Title VII and the PHRC will be analyzed under the framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) when, as here, a plaintiff has offered indirect evidence of discrimination. *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 522 (3d Cir. 1992) (citing *McDonnell Douglas*, 411 U.S. at 802; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-56 (1981)); *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 351 (3d Cir. 1999). *See also Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313 (3d Cir. 2000) (citing *Jones v. School Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999)) (noting that "[t]he analysis required for adjudicating [plaintiff's] claim under PHRA is identical to a Title VII inquiry" and therefore there is no need to address a

31

plaintiff's PHRA claims separately); *Scheidemantle v. Slipper Rock University State System of Higher Educ.*, 470 F.3d 535 n. 5 (citing *Atkinson v. Lafyette College*, 460 F.3d 447, 454 n. 6 (3d Cir. 2006) (citations omitted).

At the outset of the burden shifting analysis, Plaintiff is required to establish a *prima facie* case of sex discrimination by a preponderance of the evidence. *Ezold*, 983 F.2d at 522. In order to establish a *prima facie* case of sex discrimination, Plaintiff must demonstrate: (1) that she is a member of a protected class; (2) that she was qualified for the position from which she was discharged; and (3) individuals outside the protected class were treated more favorably. *Id.* (citing *Roebuck v. Drexel University*, 852 F.2d 715, 726 (3d Cir. 1988)); *Scheidemantle v. Slippery Rock University State System of Higher Educ.*, 470 F.3d 535 (3d Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 802-3). Plaintiff's burden in establishing a *prima facie* case of sex discrimination is relatively light. *Scheidemantle*, 470 F.3d at 539 (citing *Ezold*, 983 F.2d at 523 and *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990)). Indeed, the *McDonnell Douglas* analysis was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Weldon*, 896 F.2d at 798 (quoting *Furnco Construction Corp.v. Waters*, 438 U.S. 567, 577 (1978)). Rather, the analysis requires that the Plaintiff carry the initial burden of offering evidence adequate to create an inference of discrimination. *Id.* (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977)).

Defendant argues that Plaintiff has failed to meet her initial burden of establishing a *prima facie* case of sex discrimination, insofar as she cannot establish that she was qualified for the position from which she was terminated. (Def.'s Br. in Support at 18). Specifically, Defendant

cites to the fact that plaintiff sold only 3 cars in 5 weeks and that she was required to meet a sales quota of 8 to 12 cars per month. At the outset, the Court notes that at the time Plaintiff was terminated, she was not told that her termination was based on poor sales performance, but rather that she was being terminated for excessive absence. (Pl.'s Depo., p. 201 at 10-14). Regardless, poor sales performance is a subjective performance standard, not a job qualification. *See Weldon*, 895 F.2d at 798 (citing *Fowle v. C&C Cola*, 868 F.2d 59, 65 (3d Cir. 1989)) ("[T]o deny the plaintiff an opportunity to move beyond the initial stage of establishing *prima facie* case because he has failed to introduce evidence showing he possesses certain subjective qualities that would improperly prevent the court from examining the criteria to determine whether their use was mere pretext"). Rather, Defendant's claim that Plaintiff cannot establish a *prima facie* case "is intertwined with its assertion that Plaintiff's poor sales record was a legitimate reason for her discharge. *Id.* at 798. "[W]hile objective job qualifications should be considered in evaluating the plaintiff's *prima facie* case, the question of whether an employee possesses a subjective quality ... is better left to the later stage of the *McDonnell Douglas* analysis." *Id.* Therefore, as Defendant makes no other challenge to Plaintiff's qualifications for the sales person position ot her than performance issues, Plaintiff has produced sufficient evidence to show that she was qualified for the position and, therefore, has offered sufficient evidence to give rise to an inference of discrimination. As such, she has met her burden of proving a *prima facie* case of discrimination.

Once a plaintiff has met her burden of establishing a *prima facie* case of employment discrimination, the burden shifts to her employer to articulate a legitimate, non-discriminatory reason for the adverse employment action, *i.e.* , her discharge. *Ezold*, 983 F.2d at 521 (citing *Burdine*, 450 U.S. at 252) (citations omitted). Once the employer has done so, the burden shifts

33

back to the plaintiff to prove, by a preponderance of the evidence, that her employer's articulated reasons were mere pretext for discrimination. *Id.* (citing *Burdine*, 450 U.S. at 527; *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 898 (3d Cir. 1987), *cert denied.* 483 U.S. 1052) (citations omitted).

Defendant argues that Plaintiff cannot show pretext, that is, that she cannot rebut Defendant's legitimate, non-discriminatory reason for her discharge. In proffering a legitimate non-discriminatory reason for the adverse employment action, a defendant "'must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant.'" *Ezold*, 983 F.2d at 523 (quoting *Burdine,* 450 U.S. at 255-56). Indeed, under the *McDonnell Douglas* burden shifting framework, the employer will meet its burden of showing a legitimate, non-discriminatory reason for the adverse employment action by offering evidence "which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable unemployment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *Hicks*, 509 U.S. at 508). While Defendant's burden at this stage is relatively light, it is required to offer a clear and specific reason for the termination in order to afford Plaintiff a fair opportunity to pierce the proffered reason with facts of record. *Burdine*, 450 U.S. at 256.

Here, the Defendant has offered two non-discriminatory reasons for discharging Plaintiff: (1) that Plaintiff called off from work too many times; and (2) that Plaintiff sold only 3 cars in 5 weeks, when she was expected to sell 8 to 12 cars per month. Specifically, Barry Robison testified that, as Plaintiff's direct sales manager, he made the decision to terminate Plaintiff based on excessive absence and poor sales performance. (Robison's Depo., p. 39 at 11-14; Appx. To Def.'s

34

Motion for Summary Judgment at Exh. 10). The Court finds that, if taken as true, this evidence is enough to establish a legitimate, non-discriminatory reason for Defendant's termination of Plaintiff. As such, Defendant has met its burden at this stage and the burden of production now shifts back to Plaintiff to produce sufficient evidence of pretext. *Ezold*, 983 F.2d at 521

Plaintiff argues that both of Defendant's articulated reasons are mere pretext for discrimination. Specifically, in regard to absenteeism, Plaintiff points to the fact that according to Arlene Weller, "Plaintiff was the only employee fired in 20 years for absenteeism" from the car dealership. (Pl.'s Reply to Def.'s Motion for Summary Judgment at 5). Additionally, Plaintiff argues that Edmundson, Weller and Robison all testified to the fact that employees who called off for illness were given consideration, and none of Plaintiff's supervisors knew or attempted to find out why Plaintiff had called off. (Id.). Finally, Plaintiff argues that, by Defendant's own policies, Plaintiff was to be warned and documentation was to be placed in her file regarding the warning, but no such documentation has been produced confirming that Plaintiff received any warning. (Id.). Moreover, Plaintiff argues that Defendant's contention that Plaintiff was also discharged because of lack of sales is merely pretext. Specifically, Plaintiff points to the fact that this was not the reason given to Plaintiff when she was discharged. Furthermore, Plaintiff cites the fact that she was told by Brandon Butts when she was hired that the 8 to 12 car quota would not take effect for ninety days. Plaintiff also argues that other sales personnel, making fewer sales per week, were not terminated. Plaintiff further points to the fact that Patricia Sheffer testified that, after another female employee made a complaint about Shawn Wimbush on November 5, 2004, both Todd and Edmundson told Sheffer they had never had a problem with him prior to this date. (Pl.'s Br. in Opp. at 6).

35

In order to rebut Defendant's articulated non-discriminatory reason for her discharge, Plaintiff must ultimately persuade the Court through "'competent evidence that the presumptively valid reason [] for [the alleged unlawful employment action] [was] in fact a coverup for a ... discriminatory decision.'" *Ezold*, 985 F.3d at 524 (quoting *McDonnell Douglas*, 411 U.S. at 805). A plaintiff will not meet this burden simply by showing that the employer's decision was not shrewd or competent, rather "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proferred legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (quoting *Ezold*, 983 F.2d at 531) (emphasis in original). *See also Ryder v. Westinghouse Elec. Corp.* , 128 F.3d 128, 136 (3d Cir.1997). The Court of Appeals has further held:

> To establish circumstantial proof, the plaintiff first must present evidence that each of the defendant's reasons is pretextual, viz., each reason was a '*post hoc* fabrication or otherwise did not actually motivate the action.'

*Ryder*, 128 F.3d at 136 (quoting *Fuentes*, 32 F.3d at 765). Said evidence may be "combined by the factfinder with the evidence used to support the plaintiff's prima facie case" and the factfinder "may reasonably infer that the defendant discriminated against the plaintiff ..." *Id.* at 136 (citing *Hicks*, 509 U.S. at 571).

Here, the Court finds that there is sufficient evidence, such that a reasonable jury could find that Defendant's proffered reasons for Plaintiff's termination are merely pretext.

### 1. Plaintiff's Absences

In regard to Defendant's contention that it terminated Plaintiff based on excessive absence, the Court finds that Plaintiff has offered several pieces of evidence that would permit a reasonable

36

factfinder to infer that this articulated reason is merely pretext. First, Defendant admits that at the time of Plaintiff's discharge it had no formal written policy regarding "call offs". (Def.'s Statement of Facts at ¶2). Rather, Defendant's policy was that its sales people were expected to "show up." (Kyle's Depo., p.39 at 7). Robert Kyle, a sales manager testified as follows, in regard to the procedure by which a sales person could call off for illness:

A.    They would call into a supervisor and, you know, say I'm not coming to work today for whatever reason it was. If it was a continuing thing, that we would require a doctor's excuse or something.
Q.    Okay. And by continuing, what do you mean?
A.    Well, calling off work on an inappropriate amount of time basis.
Q.    And - - -
A.    Guess you could say that.
Q.    And what was considered to be inappropriate?
A.    I don't have any measure of that. It's just, give you an example, if we had an employee that has been there for a month and they have called off five or ten days, *probably* a problem.
Q.    Okay, I understand. Typically, if that were the case, would you talk to the employee about it?
A.    Yes, we would.

(Kyle's Depo., p. 39 at 7- 25) (emphasis added). According to Plaintiff, she called off twice in a five week period, but was never informed that she could be fired for this, prior to her termination. Moreover, Plaintiff testified that when she was hired, she was told by Brandon Butts that if she needed to call off, she should call in and inform someone that she would not be in and that she "would not get into trouble" for doing so. (Pl.'s Reply to Def.'s Statement of Facts at ¶2). Barry Robison also testified that individuals who called off for illness would be given "consideration." (Robison's Depo., p. 38 at 10-14). Additionally, there was no evidence of documentation regarding Plaintiff's absence in her personnel file, although Robison testified that had Plaintiff received a warning about her absence it was generally Defendant's policy to document that warning.

37

(Robison's Depo., p. 39 at 1-9; Edmundson's Depo., p. 32 at 1-11). Plaintiff has also offered evidence that her hours worked sufficiently covered her salary for the weeks in which she called off for sickness. (Appx. to Pl.'s Statement of Facts at Exhs. 21-22). Finally, Defendant discharged Plaintiff a mere one week after she made a complaint of harassment.

Reading these facts in a light most favorable to Plaintiff, it could be inferred that Plaintiff did not violate any policy regarding absenteeism. Furthermore, this evidence as a whole creates enough doubt that a factfinder could believe that Plaintiff did not miss an excessive amount of work under Defendant's standard policy, insofar as she missed twice in a five week period and Arlene Weller testified that, other than Plaintiff, she could not recall any other employee being discharged for excessive absence in over twenty years at the dealership. (Weller's Depo., p. 24 at 1-7). As such, a reasonable jury could find that Defendant's first purported reason for Plaintiff's termination, *i.e.*, absence, is merely pretext for discrimination.

### 2. *Plaintiff's Sales Quota*

In regard to Defendant's assertion that it also terminated Plaintiff for selling only three cars in a five week period, the Court finds that there is sufficient evidence to create an issue for the jury as to whether Defendant's proffered reason was mere pretext. Both Plaintiff and Barry Robison testified that at the time Plaintiff was terminated, she was told that the reason was for excessive absence, not for poor sales. (Pl.'s Depo., p. 200 at 16-23; p. 201 at 10-14; Robison's Depo., p. 39 at 11-14). Defendant now contends, however, that Plaintiff's failure to meet an 8 to 12 car sales quota was also a factor in the decision to discharge her. This inconsistency could lead a reasonable jury to conclude that this reason for termination is "unworthy of credence" or a mere "post hoc

fabrication." Moreover, Robert Kyle testified that there was a two week training period for new employees, during which these employees would not be required to meet a certain sales quota:

Q. Okay. During the training period were there any sales quotas imposed upon trainees?
A. During training?
Q. Yes.
A. No.

(Kyle's Depo., p. 27 at 3). Accordingly, Plaintiff would have been in a training period until the middle of October 2004 and would not have been required to meet a sales quota. However, she was terminated on November 8, 2004, three weeks later. Moreover, Plaintiff testified that at the time she was hired, she was given the impression that the 8 to 12 car quota was not a requirement and that she would not "be kicked to the curb" for failing to meet it. (Pl.'s Depo., p. 63 at 7-11). Furthermore, Plaintiff testified that Brandon Butts informed her that she would have a ninety day training period, during which she would not be expected to meet this quota. (Pl.'s Depo., p. 62-66). Moreover, at her deposition Plaintiff testified that she was not required to meet a sales quota in the first several weeks of her employment, nor did Robison or any other manager inform her of poor sales prior to her termination:

Q. Okay. So through the time that you were employed there you received this $250 a week plus whatever commissions you earned?
A. Yes.
Q. Okay. Did Barry Robison ever talk to you about improving your sales or what you could do to improve or anything of that matter?
A. No, I recall it was slow. Business was very slow.
Q. Okay.
A. And he was telling us, you know, not to get discouraged because it would pick up.
***
Q. Did he talk to you specifically about the need to improve your sales numbers?
A. No.

(Pl.'s Depo., p. 62 at 1-19).

39

Additionally, Plaintiff has pointed to several male sales persons who failed to meet an 8 to 12 car sales quota similar to Plaintiff, but were not discharged. (Appx. to Pl.'s Statement of Facts at Exh. 19). *See Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998); *cf Ezold*, 983 F.2d at 523. According to Defendant, however, Plaintiff had a sales quota that required that she have enough sales to cover her hours worked, which she failed to meet and several male individuals were discharged under the same circumstances. (Weller's Depo., p.26 at 17-25).

Based on this conflicting evidence, the Court finds that there is a genuine issue of material fact as to whether Plaintiff had a sales quota which she was required to meet during her first five weeks of employment. Moreover, the Court finds that, regardless, Plaintiff has offered sufficient evidence from which a jury could infer that her failure to meet a sales quota was pretext for discharge. Specifically, the fact that Defendant did not inform Plaintiff at the time she was discharged that her failure to meet a sales quota was the reason she was being terminated could give rise to an inference that the reason for her termination was discrimination. As such, Defendant's motion for summary judgment as to Plaintiff's discrimination claim is denied.

## C. Plaintiff's Retaliation Claim

Defendant argues that Plaintiff's retaliation claims must fail because she has failed to establish a *prima facie* case. Specifically, Defendant argues that Plaintiff has failed to offer sufficient evidence of a causal connection between the protected activity and Plaintiff's termination.

In order to establish a *prima facie* case of retaliatory discharge, Plaintiff must show (1) that she engaged in a protected activity; (2) that she was discharged subsequent to or contemporaneously with such activity; and (3) that a causal link exists between the protected activity and Plaintiff's discharge. *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (citing

40

*Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988), *cert denied sub nom*, *Jordan v. Hodel*, 488 U.S. 1006 (1989); *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986)). Defendant argues that Plaintiff has failed to establish a causal connection between the protected activity and her discharge.

Until recently, the Court of Appeals case law appears to be split as to whether temporal proximity alone will be enough to establish a causal link between a plaintiff's discharge and engaging in protecting activity. *See Price v. Delaware Dept. of Correction*, 40 F.Supp.2d 544, 553 (D.Del. 1999) (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (citations omitted). For example, in *Jalil*, the Court of Appeals held that the plaintiff "established a causal link between the two by the circumstance that the discharge followed rapidly, only two days later, upon [the defendant's] receipt of [the plaintiff's] EEOC claim." 873 F.2d at 708 (citing *Burrus v. United Tele. Co.*, 693 F.2d 339, 343 (10th Cir. 1982)).

However, in several cases, the Court of Appeals has held that temporal proximity alone was not enough to establish a causal connection between the adverse action and protected activity. *See e.g. Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 199 n. 10 (noting that "timing alone will not suffice to prove retaliatory motive"); *Quiroga v. Hasbro, Inc. and Playskool Baby, Inc.*, 934 F.2d 497, 501 (3d Cir. 1991) (quoting *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)) (holding that, while in *Jalil* the Court held that "'timing of the discharge in relation to [the plaintiff's] EEOC complaint may suggest discriminatory motives,' we stopped short of creating an inference based on timing alone").

More recently, the Court of Appeals has held that evidence of temporal proximity is sufficient to establish a causal connection between a plaintiff's protected activity and subsequent adverse employment action. *See e.g. Woodson v. Scott Paper, Co.*, 109 F.3d 913, 920 (3d Cir. 1997) (citing *Jalil*, 873 F.2d at 708)("Our cases have established that temporal proximity between the protected activity and the termination is sufficient to establish a causal link"); *E.E.O.C. v. L.B. Foster Co.*, 123 F.3d 746, 754 (3d Cir. 1997) (citing *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)) ((holding that the plaintiff established a causal connection because the plaintiff's "protected activity and [her employer's] refusal to provide a reference are sufficiently close together to allow a reasonable fact finder to find the required element of causation"). Moreover, in *Kachmar*, the Court of Appeals specifically addressed evidence of temporal proximity of an adverse employment action to a protected activity and held that:

> [c]ases in which the required causal link has been at issue have often focused on the temporal proximity between the employee's protected activity and the adverse employment action, because this is an obvious method by which a plaintiff can proffer circumstantial evidence 'sufficient to raise the inference that her protected activity was likely reason for the adverse action'.

*Kachmar*, 109 F.3d at 177 (quoting *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135

(6th Cir. 1990); *Jalil*, 873 F.2d at 708). In *Marra v. Philadelphia Housing Authority*, 497 F.3d 286,

302 (3d Cir. 2007), the Court appeared to have settled the issue holding:

> [w]e have recognized that a plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him. *Farrell,* 206 F.3d at 284. In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997). ... Where the time between the protected activity and adverse action is not so close as to

42

be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee ... .

Indeed, while unusually suggestive temporal proximity is one way of showing causal connection, it is not the exclusive way for a plaintiff to meet her burden; rather, "the proffered evidence, looked at as a whole, may suffice to raise the inference." *Id.* (citing *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986)). *See also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) (citing *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986); *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 753-54 (3d Cir. 1997))("Although timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for purposes of the *prima facie* case through other types of circumstantial evidence that support the inference"). In order to establish a causal connection, the Court should consider the evidence "gleaned from the record as a whole from which causation can be inferred." *Farrell,* 206 F.3d at 281.

In this case, Plaintiff and Defendant agree that she was discharged one week after she reported a claim of sexual harassment to her supervisor, Barry Robison. (Def.'s Statement of Facts at ¶11; Pl.'s Reply to Def.'s Statement of Facts at ¶11). The Court finds that the fact Defendant discharged Plaintiff one week after her sexual harassment complaint is "unusually suggestive" of retaliatory motive. *See e.g., Marra v. Phila. Housing Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (evidence that the adverse action was taken six weeks after complaint was sufficient evidence of causal connection); *Cf. Bailey v. Commerce Nat'l Ins. Services, Inc.*, 267 Fed.Appx. 167, 170 (3d

43

Cir. 2000) (finding temporal proximity insufficient were four months had lapsed). As such, we find that the close proximity in time between the date that Plaintiff made her complaint and the date she was terminated is enough to raise an inference of causal connection.

Additionally, as discussed above, Plaintiff has offered evidence that her discharge was not based on absence or sales performance, but on discriminatory and retaliatory motive. As such, regardless of whether temporal proximity alone is enough to establish a causal connection, the Court finds that the above evidence, in addition to the lapse of only one week between Plaintiff's complaint and her discharge, is sufficient evidence to establish a causal connection. *See Kachmar*, 109 F.3d at 177. Specifically, timing in addition to the fact that Defendant has given inconsistent reasons for Plaintiff termination will be enough to establish causation. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000). Therefore, Plaintiff has established a *prima facie* case of retaliation.

Furthermore, as discussed above in regard to Plaintiff's discrimination claim, Plaintiff has provided sufficient evidence that Defendant's proffered reasons were mere pretext for discrimination and/or retaliation, insofar as the evidence shows sufficient "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proferred legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (quoting *Ezold*, 983 F.2d at 531) (emphasis in original). The evidence discussed above is sufficient to permit Plaintiff to present said evidence to a factfinder, in order to determine whether the actual reason for her termination was retaliation for making a sexual harassment complaint.

44

Based on the above, Defendant's motion for summary judgment as it pertains to Plaintiff's retaliation claim is denied.

## D. Plaintiff's Claim for Punitive Damages

Finally, Defendant seeks summary judgment in regard to Plaintiff's claim for punitive damages. (Def.'s Br. in Support of Summary Judgment at 23-24). Defendant argues that Plaintiff cannot establish that Defendant knowingly disregarded the law in engaging in discrimination, such that punitive damages are warranted under Title VII. (Id.).

In a Title VII case, a plaintiff may be entitled to punitive damages when her employer engages in discriminatory practices with "malice or reckless indifference to the federally protected rights of an individual." 42 U.S.C. §1981(b)(1); *Kolstad v. American Dental Ass'n.*, 527 U.S. at 546-57 (holding that, an employer's actions need not be egregious in order for it to be liable be punitive damages, rather "the terms 'malice' and 'reckless' ultimately focus on the actor's state of mind"). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad*, 527 U.S. at 535; *Kant v. Seton Hall Univ.*, 279 Fed. Appx. 152, 158 (3d Cir. 2008).

Further, in order for an employer to be liable for the malice or reckless indifference of a non-managerial employee, the plaintiff must impute liability to the employer. *Id.* at 539. In order to impute liability to the employer, the plaintiff must show that the decision-maker was a managerial employee, acting within the scope of his or her employment when the decision was made. *Golson v. Green Tree Fin. Servicing Corp.*, 26 Fed. Appx. 209, 214 (4th Cir. 2002) (citing *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 443 (4th Cir. 2000), *cert. denied*, 531 U.S. 822

45

(2000). Even if an employee can show malice or reckless indifference and impute liability to the employer, an employer may avoid liability for punitive damages where it made "good-faith efforts to comply with [federal law]." *Kolstad*, 527 U.S. at 545. Indeed, "[g]iving punitive damages protection to employers who make good-faith efforts to prevent discrimination in the workplace accomplishes Title VII's objective of motivating employers to detect and deter Title VII violations." *Id.* at 546 (quotations omitted). In asserting the so-called *Kolstad* defense, the employer bears the burden of establishing its "good faith" effort to comply with Title VII. *See EEOC v. Aldi*, Civil Action No. 06- 1210, 2008 WL 859249 at \*19 n. 9 (W.D. Pa. March 28, 2008)

In this case, Plaintiff has not produced sufficient evidence to show that Defendant acted with malice or reckless indifference to the federal law. Specifically, Plaintiff has failed to produce sufficient evidence that Defendant was aware that it was acting in violation of federal law. By Plaintiff's own admission, she was made aware of a sexual harassment policy and a procedure for informing her employer of harassment on the date that she was hired. (Def.'s Statement of Facts at ¶33; Pl.'s Reply to Def.'s Statement of Facts at ¶33). Additionally, Plaintiff admits that once she made a report of harassment to Robison, both Robison and Edmundson interviewed her in order to correct the situation. (Def.'s Statement of Facts at ¶36; Plaintiff's Reply to Def.'s Statement of Facts at ¶36). While, as discussed above, there are issues of fact as to whether Defendant intentionally discriminated or retaliated against Plaintiff, intentional discrimination or retaliation alone is not enough to establish that punitive damages are warranted. *Kolstad*, 527 U.S. at 534-5; *Lafate v. Chase Manhattan Bank*, 123 F.Supp. 2d 773, 784 (D.Del. 2000). Plaintiff is required to

46

offer evidence that Defendant had knowledge that it was acting in violation of federal law, which she has failed to do. *See Kant v. Seton Hall Univ.*, 279 Fed. Appx. 152, 159 (3d Cir. 2008).

Because there is no genuine issue of material fact as to whether Defendant acted with malice of reckless indifference to federal law, Defendant's motion for summary judgment as to Plaintiff's claim for punitive damages is granted.

AND NOW, this 24th day of March, 2009, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendant's Motion for Summary Judgment (Document No. 18) is GRANTED IN PART as to the punitive damages claim only and DENIED IN PART as to the remainder of the Plaintiff's claims.

IT IS FURTHER ORDERED THAT trial in this matter will be scheduled in a separate Order of Court.

BY THE COURT:

KIM R. GIBSON,
UNITED STATES DISTRICT COURT